AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Cellular Telephone Assigned<br>Call Number 513-975-7394 | )<br>)<br>) Case No. 1:20-mj-644<br>)<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _Southern_ District of _Ohio_, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922(g)(1) | Felon in Possession of Ammunition |

The application is based on these facts:
See attached affidavit of DEA Special Agent Edward Schaub. The requested warrant will also function as a pen register order. The information likely to be obtained is relevant to an ongoing ATF criminal investigation.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Edward Schaub, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
FaceTime video *(specify reliable electronic means)*.

Date: 8/28/2020

*Judge's signature*

City and state: Cincinnati, Ohio

Karen Litkovitz, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number 513-975-7394, with international mobile subscriber identity (IMSI) 312530202208379, with listed subscriber DARIAS JACKSON (the "Target Cell Phone"), whose wireless service provider is Sprint Corp. ("Sprint"), a company headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.

2. Records and information associated with the Target Cell Phone that are within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

I.   Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the Target Cell Phone on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II.      Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 922(g)(1) involving DARIAS JACKSON.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 513-975-7394 | Case No. __1:20-mj-644__ <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Edward Schaub, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number, 513-975-7394, with International Mobile Subscriber Identity / Electronic Serial Number 312530202208379, with listed subscriber(s) DARIAS JACKSON (the "**Target Cell Phone**"), whose service provider is Sprint Corp. ("Sprint"), a wireless telephone service provider headquartered at 6480 Sprint Parkway Overland Park, KS 66251. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I have been employed with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as a Special Agent since September of 2014 and am currently assigned to the ATF

Organized Crime Squad. I am a graduate of the Criminal Investigator Training Program and Special Agent Basic Training in Glynco, Georgia. Prior to becoming a Special Agent, I was a Hopkinsville Kentucky Police Officer for eight years and was an ATF Task Force Officer assigned to the Western Kentucky Gun Crimes Task Force in Christian County, Kentucky. I am a graduate of the Department of Criminal Justice Training Center in Richmond, Kentucky. During my employment with ATF, I have been involved in numerous investigations of violations of federal and state criminal laws resulting in multiple successful prosecutions.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that DARIAS JACKSON has violated 18 U.S.C. § 922(g)(1) (felon in possession of ammunition). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### A. Introduction

7. The U.S. Attorney's Office for the Southern District of Ohio and ATF are investigating possible violations of 18 U.S.C. § 922(g)(1) by DARIAS JACKSON relating to a shooting that occurred on September 19, 2019. As explained in more detail below, the **Target Cell Phone** communicated with

2

a phone associated with JACKSON within a few hours before and after the shooting. Additionally, when cellphones were recently seized from the residence of JACKSON's girlfriend, one phone had a note attached to it that said "DJ 513-975-7394" (i.e., the phone number of the **Target Cell Phone**). "DJ" is JACKSON's nickname. The **Target Cell Phone** is not in agent custody, so I am seeking this prospective-location-data search warrant to assist agents in locating the device.

      **B.**      **On September 19, 2019, the Victim was shot several times in the parking lot outside an apartment on Groesbeck Road in Cincinnati.**

6. At approximately 3:09 am on September 19, 2019, a 911 caller reported that a victim (the "Victim," later identified as A.W.), had been shot near an address on Groesbeck Road in Cincinnati, Ohio. While officers were on their way, they received reports that someone had recently arrived at the hospital suffering from multiple gunshot wounds.

7. Officers located nine 9 mm casings and blood in the parking lot in front of the apartment on Groesbeck Road. The ammunition associated with these casings was manufactured outside the State of Ohio.

8. Shortly after his/her arrival at the hospital, the Victim was taken into surgery and was unable to provide any statements to officers for several days.

      **C.**      **On October 2, 2019, the Victim identified JACKSON as the shooter.**

9. On October 2, 2019, when shown a sequential photographic lineup containing six individuals' photographs, the Victim identified Darias JACKSON as the shooter and said he/she had known JACKSON for many years.

10. At the time of the shooting on September 19, 2019, JACKSON was on federal supervised release in connection with his 2013 conviction for Conspiracy to Possess with Intent to Distribute 1,000 Kilograms or More of Marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A), a Class A

felony punishable by more than one year in prison. JACKSON was sentenced to 50 months' imprisonment for that offense.

        **D.**        **On October 31, 2019, the Victim recanted his/her statement under suspicious circumstances.**

11. On October 31, 2019, a notary public for the hospital where the Victim was being treated was called to the Victim's room to notarize a statement in which he/she recanted his/her identification of JACKSON as the shooter.

12. Upon entering, the notary saw six people in the room: the Victim, who was sitting in his/her bed with his/her legs dangling over the side; three individuals on a love seat who the notary believed were likely the Victim's parents and a sibling; and two unknown males in the back of the room. The notary stated that the two men in the back of the room brought the typewritten affidavit to her. The Victim told the notary that he/she had read the affidavit. The notary then asked three questions to determine whether the Victim was competent to sign the affidavit ("Who is the president of the United States?" "Where are you?" and "What is today's date?"). After receiving satisfactory responses, the notary reviewed the affidavit with the Victim and noted to him/her that it appeared the Victim was recanting a previous statement. The Victim responded that he/she was recanting because the person the Victim had accused was the Victim's cousin and it was the first name he/she had thought of after the shooting and that was why he/she said the name originally. According to the notary, the Victim stated, "He's my boy; it was not him." When one of the individuals the notary believed were the Victim's parents asked what the Victim was signing, the Victim responded that it was just paperwork for the hospital.

13. The Victim signed the affidavit, and the notary notarized it. As soon as the document was notarized, the two men in the back of the room stepped forward, took the signed statement, and walked out of the room.

### E. On January 8, 2020, the Victim reaffirmed that JACKSON was the shooter.

14. In a telephone interview on January 8, 2020, the Victim again identified JACKSON as the shooter, saying that he/she had been on a substantial amount of pain medicine when he/she signed the affidavit on October 31, 2019.

### F. A video taken moments before the shooting appears to show the Victim and JACKSON in an aggressive verbal confrontation.

15. After the shooting, but before the Victim was medically stable and could be interviewed, law enforcement received anonymous tips that someone had taken video of a confrontation between the Victim and JACKSON shortly before the shooting.

16. Law enforcement later obtained a copy of the video, which shows two individuals who strongly resemble the Victim and JACKSON in an aggressive verbal confrontation. The two individuals appear to be standing in the parking lot outside the Island Breeze Apartments on Groesbeck Road, near where the Victim was shot.

17. The video's metadata show that the video was taken at 3:06 am on September 19, 2019—approximately three minutes before the 911 call reporting that the Victim had been shot. The video also partially shows a vehicle that is consistent in appearance with a vehicle registered to JACKSON; the person who appears to be JACKSON is sitting on that vehicle in parts of the video. The individuals' words cannot be clearly heard on the video.

### G. Calls between JACKSON and his significant other, J.B., contained evidence that JACKSON's cellphones were at their shared residence.

18. An arrest warrant was eventually issued for JACKSON; however, JACKSON self-surrendered on October 4, 2019, before the arrest warrant was executed. At the time of his surrender, JACKSON did not have a cellphone on his person; however, he told officers that his phone number was XXX-XXX-5587 (the "5587 Phone"). The 5587 Phone is also the contact number that JACKSON's probation officer had used to contact JACKSON.

19. I listened to certain jail calls JACKSON made after his arrest, including calls from October 2019 on which JACKSON spoke with a woman who was using a phone number ending in 5895 (the "5895 Phone").

20. In February 2020, when asked about phone numbers relating to JACKSON, JACKSON's probation officer reported that J.B., JACKSON's significant other, had contacted him using the 5895 Phone. I therefore believe that the 5895 Phone is used by J.B.

21. On one call between JACKSON and J.B., who was using the 5895 Phone, JACKSON asserted that J.B. had been looking through his phone. What follows is a partial transcript of the relevant portions of that call. These transcripts are based on my best attempt to understand the words being said and convey what I believe to be the substance of the call; however, the poor audio quality made it difficult to determine the exact words being said:

> JACKSON: So, why you was going through my phone?
>
> J.B.: I told you: I was bored.
>
> JACKSON: You keep saying that [laughs]
>
> J.B.: I mean, I could have lied and said that somebody told me [U/I] …. I could have lied and made up a story [laughter] …. It's just making me feel better, because [U/I] my mind be [U/I]
>
> JACKSON: Oh, so you activated my Facebook?
>
> J.B.: You hear me?

6

| | |
|---|---|
| JACKSON: | Huh? |
| J.B.: | I said you hear me claiming to get an Instagram [U/I] |
| JACKSON: | How'd you get in Facebook? |
| J.B.: | Because when you download the app, or some app… [laughs] |

22. Based on my training and experience and knowledge of this case, including the fact that JACKSON did not have a cellphone on him when he self-surrendered, I believe that on this portion of the call, JACKSON and J.B. were discussing how JACKSON had left his phone with J.B., and J.B. had gone through it.

23. Later on the same call, JACKSON and J.B. again appeared to be discussing how J.B. was looking through the contents of JACKSON's phone:

| | |
|---|---|
| JACKSON: | I'm saying, you're talking about something that's super old, though, babe. |
| J.B.: | No, it's not old [U/I] You was just texting her at the last [U/I]. And that's just what I've seen. And you cut off half of the messages, so I ain't gonna tell [U/I] what y'all was talking about beforehand. |
| JACKSON: | I cut off half the messages? |
| J.B.: | Yeah, like you just [U/I] the part that you wanted [U/I] |
| JACKSON: | Go ahead |
| | [. . . .] |
| J.B.: | And why you gon' be my baby daddy? [U/I] |
| JACKSON: | [U/I] left you, left [U/I] phone. |
| | [cross-talk/noise in background] |
| J.B.: | And I was so surprised, because [U/I] the first time. You gave it to your brother. |

7

| | | |
|---|---|---|
| JACKSON: | | I mean, I'm saying, like, motherfucker ain't called, nothing', like -- |
| J.B.: | | I did tell you somebody called. So who told him -- |
| JACKSON: | | Yeah, but that's, that's out of the blue. You know that. I just told you. |

24. Based on my training and experience and knowledge of this case, I believe that in this portion of the call, J.B. was asserting that she had reviewed text messages on JACKSON's phone and had noticed that he had deleted "half of the messages" that JACKSON had exchanged with another woman.

25. On another call, JACKSON said to J.B.: "You got my phone right there? Do me a favor." When J.B. asked "Which one?", JACKSON responded, "The white and black one."

26. Based on the foregoing calls, I believe that JACKSON gave J.B. multiple cellphones for safekeeping before self-surrendering. JACKSON has been in custody since these calls were made.

27. On July 7, 2020, I asked J.B. where she lived; she told me that she lived at an address on Applegate Avenue in Cheviot (the "Applegate Address"). According to JACKSON's probation officer, on or about October 1, 2019, JACKSON said that he and J.B. were moving to the Applegate Address on or about October 5, 2019.

28. According to JACKSON's probation officer, JACKSON and J.B. have been dating since high school. They have three children together, the youngest being born during JACKSON's current incarceration.

   **H.  During a search of J.B. and JACKSON'S shared residence, agents found cell phones matching those referenced on the jail calls.**

29. On July 16, 2020, federal agents executed a search warrant at the Applegate Address and seized multiple cell phones, including cell phones matching those described in the jail calls between JACKSON and J.B.

30. When I removed the protective case from one of the cell phones—an iPhone 7, model A1660, which was black and white, consistent with the above-described calls on which JACKSON mentioned "the white and black [phone]"—there was piece of paper taped to the back of the phone on which someone had hand written "DJ 513-975-7394" (i.e., the phone number of the **Target Cell Phone**).

31. I reviewed cell phone records for the **Target Cell Phone** and found that it had been in contact with JACKSON's 5587 Phone at approximately 10 p.m. on the night of the shooting (i.e., on the 18th, with the shooting happening in the early morning hours on the 19th, shortly after 3 a.m.). The **Target Cell Phone** was also in contact with JACKSON's 5587 Phone at approximately 6:16 a.m. and 6:44 a.m. on the 19th, just hours after the shooting. The **Target Cell Phone** was also in contact with J.B.'s 5895 Phone at approximately 10 p.m. on the night of the shooting and at approximately 6:56 a.m. the morning after the shooting.

32. Based on phone records showing that the **Target Cell Phone** was making calls as recently as July 30, 2020—after the search warrant was executed at the Applegate Avenue address—I do not believe that the **Target Cell Phone** is in government custody. Due to the note identifying the **Target Cell Phone** as "DJ['s]", however, and in light of the phone calls between the **Target Cell Phone** and JACKSON's 5587 Phone within hours before and after the shooting, I believe that the **Target Cell Phone**, whether used by JACKSON or an associate of his, likely contains evidence relevant to the shooting of the Victim, including evidence relating to communications with JACKSON and evidence relating to JACKSON's whereabouts at relevant times leading up to and following the shooting. For these reasons, I am seeking a search warrant for prospective location data for the **Target Cell Phone** to assist agents in locating and seizing it. Based on my training and experience, obtaining location data for

9

30 days should be sufficient to assist agents in finding the location(s) where the **Target Cell Phone** is being stored and obtaining a premises search warrant to seize it.

8. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. [Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

9. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the **Target Cell Phone** on Sprint's network or with such other reference points as may be reasonably available.

10. Based on my training and experience, I know that Sprint can collect cell-site data about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the

10

communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Sprint typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

11. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

12. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

13. I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint. I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **Target Cell Phone** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

14. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

Respectfully submitted,

EDWARD SCHAUB
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Attested to by the Applicant in accordance with Federal Rule of Criminal Procedure 4.1 on August __28__, 2020.

HON. KAREN L. LITKOVITZ
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephone assigned call number 513-975-7394, with international mobile subscriber identity (IMSI) 312530202208379, with listed subscriber DARIAS JACKSON (the "Target Cell Phone"), whose wireless service provider is Sprint Corp. ("Sprint"), a company headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.

2. Records and information associated with the Target Cell Phone that are within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

I. Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the Target Cell Phone on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II. Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 922(g)(1) involving DARIAS JACKSON.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.